F I L E D
United States Court of Appeals
Tenth Circuit

August 20, 2007

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT J. POUND; PRO PRODUCTS,
INC.,

       Plaintiffs-Appellants,

v.

AIROSOL COMPANY, INC.,

       Defendant-Appellee.

No. 06-3299

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 02-CV-2632-CM)**

---

Brett E. Nelson, (Gregory M. Gotwald with him on the briefs), Plews Shadley Racher &
Braun, Indianapolis, Indiana, for Plaintiff-Appellant.

Paul S. Penticuff, (John W. Cowden with him on the brief), Baker, Sterchi, Cowden &
Rice, L.L.C., Overland Park, Kansas, for Defendant-Appellee.

---

Before **BRISCOE, EBEL**, and **HARTZ,** Circuit Judges.

---

**BRISCOE**, Circuit Judge.

In this citizen-suit action, Plaintiffs-Appellants Robert Pound and Pro Products,

Inc. (collectively "Pro Products") challenge an order of the district court declining to

impose a monetary penalty against Defendant-Appellee Airosol Company, Inc. (Airosol)

for violations of the Clean Air Act (CAA, or "the Act"). Pro Products also challenges the district court's order denying its request for attorney fees and costs. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and REVERSE and REMAND for further proceedings.

I

Pro Products sells habitat control products for exotic animals, primarily reptiles. One such product is Provent-a-Mite, an insecticide used to control mites and ticks on reptiles. By early 2002, Pound, the owner of Pro Products, learned that certain reptile dealers and reptile product suppliers were marketing a pesticide labeled Black Knight for use in eradicating reptile parasites. Dealers and suppliers were marketing Black Knight for this use despite the fact that Black Knight was not registered or approved for the treatment of pests affecting reptiles.

Black Knight, a pesticide manufactured by Airosol, is registered under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) for treatment of various household pests. Black Knight is an aerosol product containing hydrochlorofluorocarbons (HCFCs) 22 and 142 (monochlorodifluoromethane and monochlorodifluoroethane, respectively), Class II substances as defined and regulated by § 602(b) of the CAA, 42 U.S.C. § 7671a(b). As of February 10, 1993, Airosol manufactured and sold the identical product, registered under Environmental Protection Agency (EPA) Registration No. 901-82, under three different labels: Black Knight, Airosol Aircraft Insecticide, and Government Insecticide.

The 1990 Amendments to the CAA included provisions to phase out the use of ozone-depleting substances such as those contained in Black Knight, and provided that, unless a manufacturer has applied prior to January 1, 1994, for an exception or exemption for reformulation as set forth by statute or regulation, "[e]ffective January 1, 1994, it shall be unlawful for any person to sell or distribute, or offer for sale or distribution in interstate commerce . . . any aerosol product or other pressurized dispenser which contains a Class II substance . . . ." 42 U.S.C. § 7671i(d)(1)(A); see also 40 C.F.R. § 82.65(b), (c) (setting forth procedure to apply for temporary extension). Thus, Class II substances, such as those contained in Black Knight, are banned by the CAA, although the distribution or sale of products containing banned substances is permitted for an additional period *if* a reformulation exemption is first obtained.

On December 18, 2002, Pro Products brought suit against Airosol under the citizen suit provision of the CAA, 42 U.S.C. § 7604(a)(1). Pro Products sued Airosol, alleging, in pertinent part, that Airosol was in violation of § 7671i(d)(1)(A) of the CAA. On March 10, 2004, the district court granted Pro Products' motion for partial summary judgment finding, as a matter of law, that Airosol's manufacture, sale, and distribution of Black Knight violated § 7671i(d)(1)(A) of the CAA.[1] Following a bench trial, the district court entered an order on July 18, 2006, declining to penalize Airosol for its CAA violations. The court cited other factors, but relied heavily on its conclusion that Pro Products' suit was brought to remove a competitor from the market and not out of a concern for the

---

[1] Airosol does not contest the district court's conclusion that it violated the Act.

environment. The court also denied Pro Products' renewed request for attorney fees and costs noting a circuit split, and no guidance from this court, on whether an award of attorney fees is appropriate "when the prevailing party brought the suit for personal financial gain rather than to further the purpose of the Clean Air Act." Appx. at 545. Pro Products now challenges the district court's decision not to penalize Airosol for violating the Act, and also the district court's denial of its request for attorney fees and costs.

II

*A.  CAA Penalty Analysis*

We will uphold a district court's findings of fact in support of a CAA penalty unless the findings are clearly erroneous. See Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 79 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991).[2] The district court's weighing of those facts, and its penalty determination, are reviewed for abuse of discretion. See United States v. Dell'Aquilla, 150 F.3d 329, 338 (3d Cir. 1998). However, we "review de novo the statutory interpretation behind the district court's decision." United States v. B & W Inv. Props., 38 F.3d 362, 366 (7th Cir. 1994) (reviewing a Clean Air Act citizen suit). Specifically, our review of the district court's "legal construction" of the Clean Air Act's penalty factors "is plenary." United States v. Allegheny Ludlum Corp., 366 F.3d 164,

_____

[2] The penalty provisions of the CAA and the Clean Water Act (CWA) are virtually identical; thus, CWA cases are instructive in analyzing issues arising under the CAA. See United States v. Dell'Aquilla, 150 F.3d 329, 338 n.9 (3d Cir. 1998) ("[T]he Clean Water Act and the Clean Air Act are *in pari materia*, and courts often rely upon interpretations of the Clean Water Act to assist with an analysis under the Clean Air Act.") (citations omitted).

-4-

171 (3d Cir. 2004).

Section 7604(a) of the CAA provides the district court with authority to "enforce such an emission standard or limitation, or such an order . . . and to apply any appropriate civil penalties . . . ." 42 U.S.C. § 7604(a). Section 7413(e)(1) sets forth the factors that a court "shall" take into consideration in determining the penalty, if any, to be assessed for a violation of the Act:

> In determining the amount of any penalty to be assessed under this section or section 7604(a) of this title, the Administrator or the court, as appropriate, shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

42 U.S.C. § 7413(e)(1).[3]

"In considering fines under the Act, courts generally presume that the maximum penalty should be imposed." United States v. B & W Inv. Props., 38 F.3d at 368; see also Dell'Aquilla, 150 F.3d at 339 ("Courts usually calculate a fine under the CAA by starting

---

[3] We reject as meritless Airosol's argument that because "the district court decided that this was not an appropriate case for the imposition of a civil penalty, [it] was not required to apply the 'penalty assessment criteria' in section 7413(e)." Appellee's Br., p. 17. Airosol fails to cite, and we cannot locate, any authority for this position. Indeed, the Act itself, as well as persuasive authority, indicate that when determining the appropriateness of a civil penalty under the CAA, a district court is required to consider the factors set forth in § 7413(e)(1). See 42 U.S.C. § 7413(e)(1) ("In determining the amount of *any* penalty to be assessed under this section . . . the court . . . shall take into consideration . . . .") (emphasis added); see also Dell'Aquilla, 150 F.3d at 339 ("The statute only requires that the fine be consistent with a consideration of each of the factors the court is obligated to evaluate.").

with the maximum penalty."). When starting with the maximum penalty, courts then consider the factors described in 42 U.S.C. § 7413(e) to determine what degree of mitigation, if any, is proper. See Dell'Aquilla, 150 F.3d at 339; see also United States v. Marine Shale Processors, 81 F.3d 1329, 1337 (5th Cir. 1996) ("[W]hen imposing penalties under the environmental laws, courts often begin by calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist."). This is not to say that this methodology *must* be used, but merely that we agree with the persuasive case law that concludes that this approach is satisfactory. Dell'Aquilla, 150 F.3d at 338 ("[A]lthough courts may, and frequently do, begin at the maximum, we have never suggested that such a procedure is always appropriate."). Other courts, for example, use a "bottom up" approach whereby the economic benefit a violator gained by noncompliance is established and then adjusted upward or downward, rather than a "top down" approach in which the maximum possible penalty is first established, then reduced following an examination of "mitigating" factors. See United States v. Mun. Auth. of Union Twp., 150 F.3d 259, 265 (3d Cir. 1998) (collecting cases in a CWA case).

Here, the district court calculated the maximum possible penalty under the CAA, then mitigated that penalty to zero based on the following findings: (1) a penalty greater than $20,000 would bankrupt Airosol, (2) Pro Products never established that Airosol's violations of the Act were intentional, (3) Airosol had not been previously penalized for similar violations, (4) Airosol voluntarily ceased manufacturing and selling Black Knight

-6-

and will no longer benefit from its violations, (5) the EPA neither cited Airosol nor elected to become involved in the case, (6) Airosol's violations of the CAA were not a serious threat to the environment, and (7) "most importantly," Pro Products' purpose in bringing suit was to remove a competitor rather than a genuine concern for the environment. Appx. at 543-4.

Pro Products makes four arguments in support of its contention that the district court abused its discretion in concluding that it was not appropriate to penalize Airosol for its violations of the CAA. First, Pro Products argues that the district court relied on improper factors not listed in § 7413(e)(1). Second, it argues that the district court failed to address required factors enumerated in § 7413(e)(1). Third, it argues that the factors relied on by the district court do not support a complete mitigation of penalty. Last, it argues the district court did not consider certain evidence supporting the imposition of a penalty.

### 1.     *Consideration of Improper Factors*

Pro Products argues that the district court relied on three improper factors in mitigating Airosol's penalty to zero. We agree. Specifically, the district court first implied that mitigation is proper where "a private citizen [rather than the EPA] brought suit against [a defendant] for its Clean Air Act violations." Appx. at 544. The district court also looked to Pro Products' failure to "establish at trial that Airosol intentionally violated the Clean Air Act" as a mitigating factor. Id. at 543. Finally, the district court

found it most important that Pro Products' motivation to enforce the CAA was "economic" rather than "environmental." Id. at 544.

We review de novo whether unlisted factors such as these are properly considered "other factors as justice may require" within the meaning of § 7413(e)(1). See Powell, 913 F.2d at 80; see also United States v. Allegheny Ludlum Corp., 366 F.3d 164, 171 (3d Cir. 2004) (concluding that imposition of a penalty under the CWA is reviewed for abuse of discretion, but review of the construction of CWA's penalty provision is plenary). In Powell, a citizen suit under the CWA, the district court granted summary judgment finding that the defendant manufacturer violated the CWA. Powell, 913 F.2d at 69. Following a bench trial on the issue of penalties, the district court assessed $3,205,000 in civil penalties. Id. In calculating the penalty, the district court determined the maximum penalty to be $4,205,000 and reduced that amount by $1,000,000 "because the EPA and the [New Jersey Department of Environmental Protection] had failed to diligently prosecute [the violator]." Id. at 69-70. The Third Circuit Court of Appeals reversed in part, finding that the "mere failure by governmental agencies to prosecute [an alleged violation] does not allow a court to reduce a penalty." Id. at 81. The court held that such failure by itself is not a factor that may be considered within the "other matters as justice may require" factor set forth in the CWA's penalty statute. Id. The Powell court also found that because the EPA had not "affirmatively recognized and excused noncompliance," governmental inaction was not a basis for mitigation based on the violator's "good faith." Id.

When calculating the appropriateness of a civil penalty, the CAA, like the CWA, requires a district court to consider certain listed factors, but also permits a district court to consider other unlisted factors "as justice may require."  Compare 33 U.S.C. § 1319(d) (considering "other matters as justice may require"), with 42 U.S.C. § 7413(e)(1) (considering "other factors as justice may require").  Both the CWA and the CAA provide that a citizen suit can only be brought if there is a lack of prosecution by the state, or relevant agency.  Compare 33 U.S.C. § 1365(b)(1)(B) ("No action may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action."), with 42 U.S.C. § 7604(b)(1)(B) ("No action may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil action . . . to require compliance.").  Thus, the "mere failure by governmental agencies to prosecute [a violation] does not allow a court to reduce a penalty."  Powell, 913 F.2d at 80.  Here, the EPA was aware of the instant litigation, but had "not cited Airosol or elected to intervene in this litigation." Appx. at 543.  We agree with the Third Circuit's approach in Powell and conclude that the district court erred in relying on agency inaction as a mitigating factor when conducting its CAA penalty analysis.

Second, the fact that Pro Products "did not establish at trial that Airosol intentionally violated the Clean Air Act" is also an impermissible basis for a complete mitigation of Airosol's penalty. Appx. at 543.  The Act imposes strict liability upon owners and operators who violate the Act.  See Dell'Aquilla, 150 F.3d at 332; B & W Inv. Props., 38 F.3d at 367.  This is not to say that intent cannot be considered when

-9-

assessing a CAA penalty, but here, as regards the district court's placing a burden on Pro Products to establish that Airosol intentionally violated the CAA, it erred. Also, we are mindful that the district court found that from October 4, 1996 to April 30, 2005, Airosol sold 64,017 twelve-ounce cans of Black Knight and 548 twelve-pound cylinders of Black Knight all containing substances banned by the CAA, and that Airosol pursued this course of conduct by relying on a letter it alleges it sent to the EPA, but was never received. Thus, insofar as Airosol's intentions are relevant here, there is insufficient evidence in the record to completely mitigate the imposition of a penalty on these grounds alone.[4]

Third, the district court expressly determined that the "most important" factor in its decision to mitigate Airosol's penalty was the motivation of the citizen plaintiffs who brought suit against Airosol for its CAA violations. We conclude this factor is irrelevant to a determination of the amount of penalty to be imposed under the CAA. First, we have found no authority for the district court's conclusion that a plaintiff's motivation is a significant factor when determining what penalty should be imposed against a CAA violator. Moreover, "Congress enacted [the CAA citizen suit provision] specifically to

---

[4] By addressing Airosol's intent to violate the Act, the district court may have been responding to Airosol's "good faith efforts to comply" with the Act. The district court included in its factual findings that "Airosol contends that it believed it had obtained a reformulation exemption. . . ." (Appx. at 539). While the district court did not find that Airosol had a reformulation exemption which would have permitted continued sales, nor did the court include any mention of a "good faith effort to comply" with the Act in its legal conclusions, its finding regarding Airosol's contention may have been the basis for its legal conclusion regarding Airosol's lack of intent.

encourage citizen participation in the enforcement of standards and regulations established under this Act." Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 560 (1986) (citations omitted). Congress "intended the section to afford citizens very broad opportunities to participate in the effort to prevent and abate air pollution." Id. (citations omitted). Thus, the fact that a citizen-suit plaintiff may have an economic interest in the outcome of the litigation does not justify mitigation of penalties against the violator. To the contrary, one of the purposes of these penalty provisions is to ensure that companies like Airosol do not gain a competitive advantage from violating the CAA. Powell, 913 F.2d at 79 ("Violators should not be able to obtain an economic benefit vis-a-vis their competitors due to their non-compliance with environmental laws.") (citations omitted). In short, there is no principled basis for relying on Pro Products' motivation for bringing the suit, or the fact that the parties are competitors, to determine Airosol's penalty. Thus, the district court's reliance on these factors was error.

2.      *Failure to Address Certain Statutorily Enumerated Penalty Factors*

We conclude further that the district court also erred as a matter of law by failing to address certain statutory factors that must be considered in a CAA penalty analysis. Although the CAA does not prescribe what weight to apply to these factors, 42 U.S.C. § 7413(e)(1) of the Act clearly requires that the district court consider: (1) the size of the business and the economic impact of the penalty on the business; (2) the seriousness of the violation; (3) the violator's full compliance history; (4) good faith efforts to comply; (5) the duration of the violation as established by any credible evidence; (6) payment by

-11-

the violator of penalties previously assessed for the same violation; (7) the economic benefit of noncompliance; and (8) the seriousness of the violations.

Here, the district court did not consider the size of Airosol's business, Airosol's full compliance history, good faith efforts to comply, or the duration of the violation. Because the failure to consider the enumerated factors in § 7413(e)(1) is reversible error, we remand for the district court to include in its penalty analysis these additional factors. See, e.g., Dell'Aquilla, 150 F.3d at 339 (reversing penalty award for failure to consider evidence in violation of CAA mandate to consider "economic impact of the penalty").

Specifically, in its order where it declined to penalize Airosol for its CAA violations, the district court made a factual finding that "[d]ue to its financial troubles, Airosol has decreased its workforce from approximately ninety employees to approximately thirty employees." Appx. at 541. Nonetheless, in the legal analysis that follows, the district court neither explicitly nor implicitly considered this factor.

The district court also failed to consider Airosol's "full compliance history and good faith efforts to comply" with the CAA. 42 U.S.C. § 7413(e)(1). The district court's findings make clear that prior to suit (1) Airosol had never been in compliance with the amendments banning Class II substances, and (2) Airosol was aware of the Class II ban, but failed to properly file an application for reformulation, or to meaningfully inquire about the application it allegedly sent, or to otherwise comply with the Act. Also, Airosol sold Black Knight for months after the district court determined that its sale of Black Knight violated the Act. Appx. at 412 ("Airosol admitted to offering Black Knight for

sale until August 26, 2004[, but on this] date the sale of Black Knight was illegal pursuant to this court's March 10, 2004 order . . . ."). The district court failed to consider any of this evidence.

Finally, in its order declining to penalize Airosol for its CAA violations, the district court made a series of factual findings indicating that Airosol's violations lasted more than a decade, from January 1, 1994, through March 10, 2004. Airosol argues that since the district court found that Airosol's violation of the Act extended over a period of 2,715 days (when considering a period from October 4, 1996, through March 10, 2004), this finding was somehow meaningfully considered by the district court in its penalty analysis. Yet, the district court never discussed the duration of the violation as a factor in its penalty analysis, nor did it incorporate by reference its factual findings regarding duration of the violation into its legal analysis. On remand the district court should include in its penalty analysis consideration of these three factors, as well as the related evidence referenced above.

### 3.    *Improper Consideration of Statutorily Enumerated Factors*

Pro Products next argues that to the extent the district court considered certain statutory factors set forth in 42 U.S.C. § 7413(e)(1), it erred as a matter of law in doing so. We agree. The limited analysis conducted by the district court regarding the "economic benefit" factor of § 7413(e)(1) resulted in its conclusion that "Airosol will not *continue* to benefit from its violations, as it has voluntarily ceased manufacturing and selling Black Knight." Appx. at 543 (emphasis added). This conclusion is a

-13-

misapplication of 42 U.S.C. § 7413(e)(1) because it requires a court to consider the economic benefit that the violator *has* received as a result of its violations of the CAA, not the economic benefit it *will* receive in the future. The district court's interpretation of the statute would permit any violator of the CAA to mitigate a potential penalty simply by ceasing to pollute. We reject this interpretation of the Act.

Also, the district court's conclusion which negates the seriousness of Airosol's violations as a basis for mitigation is not supported by any findings of fact. Instead, the district court stated that it "does not believe that Airosol's Clean Air Act violations were a serious threat to the environment or the public [because] the parties did not offer, and the court is not aware of, a single measurable injury to the environment or the public caused by Airosol's manufacture and sale of Black Knight." Id. While there is no statutory definition of "seriousness of the violation," the effects of ozone pollution are well documented.[5] The issue then is whether a lack of evidence on the record linking Airosol's CAA violations to discrete damage to either the environment or the public *necessarily* justifies the conclusion that Airosol's violations were not "serious." We conclude it does not.

---

[5] For example, EPA public notices make it abundantly clear the agency considers ozone pollution a significant problem. See, e.g., 58 Fed. Reg. 50464 (September 27, 1993) ("The Stratospheric ozone layer protects the earth from the penetration of harmful ultraviolet (UV-B) radiation. On the basis of substantial scientific evidence, a national and international consensus exists that certain man-made halocarbons, including chlorofluorocarbons . . . must be restricted because of the risk of depletion of the stratospheric ozone layer through the release of chlorine and bromine . . . ."); Id. ("[S]cientific advances have indicated that the impact of man-made ozone-depleting substances on the stratosphere was more severe than previously thought.").

In Powell, the Third Circuit upheld the district court's finding that the defendant's violations of the CWA were serious, even absent a showing which directly linked defendant's discharges to actual harm to the environment or the public. See Powell, 913 F.2d at 79. In other words, Powell held that a court may still impose a penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect. Considering the difficulty of measuring these types of harm, we find the logic of Powell persuasive. We therefore conclude that the mere absence of a measurable harm to the public or the environment stemming from a particular CAA violation does not necessarily indicate that a violation is not "serious." Particularly important here is the fact that Congress had explicitly banned the substances contained in Airosol's noncompliant product, Black Knight.

The statutory "economic benefit" factor requires the district court to apply a retrospective rather than a prospective analysis, but the court has discretion in deciding how to calculate the economic benefits received from the defendant due to its noncompliance with the CAA. The parties also disagree about how to measure the "economic benefit of noncompliance" factor set forth in § 7413(e)(1). Pro Products argues that any profits realized through the sale, or offer of sale, of a prohibited product ought to be included when assessing the economic benefit of a CAA violation, the rationale being that one ought not to profit from one's wrongful conduct.[6] Airosol, on

_____

[6] Pro Products also argues that the district court erred in refusing to consider within its economic benefit of noncompliance analysis the fact that during the time Airosol earned income
(continued...)

-15-

the other hand, argues that the economic benefit of noncompliance is more properly measured by considering the costs that it would have incurred to comply with the CAA (i.e., the cost of reformulation). While the question is not easily resolved, we conclude that Pro Products has the better argument.

While the economic benefits calculation ideally begins with the "costs . . . that should have been spent, to achieve compliance," Ludlum, 366 F.3d at 178 (calculating economic benefit to polluter by the least costly method of compliance), "precise economic benefit to a polluter may be difficult to prove," Powell, 913 F.2d at 80. Given this reality, we acknowledge that there are "methods other than the delayed or avoided capital expenditure for ascertaining economic benefit," Municipal Authority of Union Township, 150 F.3d at 266 (analyzing "economic benefit" penalty provision set forth in CWA in terms of profits gained, rather than expenses avoided, from noncompliance due to unique circumstances), and we will accord the district court wide discretion in its calculation, see id. at 264. Thus, if, on remand, the district court is unable to determine the costs Airosol would have expended in order to become compliant with the CAA, then it is free to consider any reasonable alternative to determine Airosol's economic benefit

_____

[6](...continued)
from selling "Black Knight," it also earned income from selling "Black Knight" under the names Aircraft Insecticide and Government Insecticide. We decline to address this issue because the district court's March 10, 2004 order concluding Airosol violated the CAA for its sale and offer for sale of Black Knight, did not consider or find that Airosol's sale of Aircraft Insecticide and Government Insecticide also violated the CAA.

-16-

of noncompliance – such as, the EPA's CAA Stationary Source Civil Penalty Policy[7] and/or some degree of profits gained – as long as its analysis is not in conflict with the CAA or basic economic principles.

Last, Airosol claims that the record does not establish what costs it would have incurred to reformulate Black Knight and implies that, as a result, it should not be penalized for its violations of the CAA. As noted above, however, because Airosol's cost of reformulation is not the only possible measure of its economic benefit of noncompliance, whether a penalty will be imposed in this case will not rise or fall on a cost of reformulation calculation. And, even if we assume, *arguendo*, that there is no reasonable means to measure Airosol's economic benefit of noncompliance, it follows that there would be insufficient evidence to mitigate the imposition of a penalty on this basis, and not, as Airosol suggests, that it should not be penalized at all. See B & W Inv. Props., 38 F.3d at 368 (concluding that "courts generally presume that the maximum penalty should be imposed," then mitigate the penalty in accord with the § 7413(e)(1) factors).

### B. *Attorney Fee Analysis*

Pro Products also challenges the district court's denial of its motion for attorney fees and costs. "We review a district court's decision on whether to award attorney fees

_____

[7] The EPA developed the CAA Stationary Source Civil Penalty Policy and Appendices to provide guidance in calculating penalties for violations of the CAA. Appendix IX provides penalty guidance for the sale of small containers of refrigerants in violation of the stratospheric ozone provisions of the CAA. See Appellant's Supp. Appx., p. 1812.

for abuse of discretion, but we review de novo the district court's application of the legal principles underlying that decision." Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143, 1146 (10th Cir. 2000). For the following reasons, we conclude the district court erred.

*1.      Some Degree of Success on the Merits*

Under the American rule, parties to a lawsuit ordinarily pay their own attorney fees. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). There are several exceptions to this principle. Most notably, there are certain statutory fee-shifting provisions that permit a court to order one party to pay the fees and costs of another. Bennett v. Coors Brewing Co.,189 F.3d 1221, 1238 (10th Cir. 1999). Typically, these statutes allow courts to award fees to the "prevailing party." See, e.g., Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988 (2000) ("[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."). Less commonly, the CAA, and other federal statutes, allow courts to "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 42 U.S.C. § 7604(d); see also Loggerhead Turtle v. The County Council of Volusia County, 307 F.3d 1318, 1322 n.5 (11th Cir. 2002) (collecting statutes).

While this court has not had occasion to address when an award is "appropriate" under the CAA, the Supreme Court has held that "absent some degree of success on the merits by the claimant, it is not 'appropriate' for a federal court to award attorneys' fees .

-18-

. . ."[8] Ruckelshaus v. Sierra Club, 463 U.S. 680, 694 (1983); id. at 682 ("We conclude that the language of the section, read in the light of the historic principles of fee-shifting in this and other countries, requires the conclusion that some success on the merits be obtained before a party becomes eligible for a fee award under § 307(f).").  The Supreme Court has also interpreted the attorney fee provision of the CAA as a less stringent standard than that of other civil rights statutes that award attorney fees to "prevailing parties," stating that the attorney fee provision of the CAA "was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties – parties achieving *some success*, even if not major success." Ruckelshaus, 463 U.S. at 688 (emphasis in original).  Thus, one does not have to succeed completely on a CAA claim to achieve "some success" which would, in turn, merit the award of fees and costs.

Here, Pro Products instituted its CAA action to enforce the provisions of the Act which ban certain aerosols.  As noted, the district court entered an order concluding that, as a matter of law, "Airosol's manufacture, sale, and distribution of Black Knight violated the Clean Air Act." Appx. at 73.  Subsequently, the district court declined to penalize Airosol for its violations of the Act.  Under the less exacting standard of the CAA attorney fee provision, we conclude that a plaintiff achieving a judicial holding that a

_____

[8] In Ruckelshaus, the Court specifically considered the fee award language of § 307(f) of the CAA, 42 U.S.C. 7607(f). This language is identical to the language of § 304(d), 42 U.S.C. § 7604(d), which we consider here, and the Court indicated that its holding applied with equal force to the award of attorney fees under § 304(d). See Ruckelshaus, 463 U.S. at 691-92.

party violated the Act is "some degree of success on the merits." To the extent the district court concluded otherwise, it erred.

### 2. *The Public Interest*

Courts have also held that an "appropriate" award of attorney fees under the citizen suit provision under the CAA also requires the movant to serve the public interest by assisting in the proper interpretation, or implementation of the statute. Sierra Club v. EPA, 769 F.2d 796, 800 (D.C. Cir. 1985) ("[T]he party must have served the public interest by assisting in the proper implementation of the statute."); Florida Power & Light Co. v. Costle, 683 F.2d 941, 942 (5th Cir. 1982) (noting that the legislative history of the CAA indicates that its purpose is to "encourage litigation which will assure proper implementation and administration of the Act or otherwise serve the public interest"). The district court denied Pro Products' request for attorney fees because it "brought suit under the Clean Air Act's citizen suit provision and [stood] to gain significant financial interest in doing so." Appx. at 414. We agree with Pro Products that the district court erred by relying on Pro Products' financial motivation in denying its request for fees.

The Congressional commentary surrounding the passage of the CAA demonstrates that Congress intended that attorney fees should be awarded to plaintiffs who, by bringing an action against an alleged violator of the Act, minimize the amount of pollution in the atmosphere, and thus promote the Act's goal. See generally Del. Valley Citizen's Council, 478 U.S. at 560. This legislative background, as well as persuasive case law from other circuits, causes us to conclude that CAA plaintiffs who serve the public

interest by assisting in the proper implementation of the statute are "entitled to fees for litigating the claims on which they obtained at least a modicum of success." Sierra Club, 769 F.2d at 800-802.

Here, Pro Products brought suit to enforce the CAA's ban on Class II substances. In bringing this action in which it was partially successful, Pro Products has promoted the enforcement of the Act and assisted the EPA in achieving the Act's statutory goals. We conclude that the public interest element is satisfied. We acknowledge that there is some persuasive authority suggesting that it may not be appropriate to award a party attorney fees under the CAA when that party brought suit only to serve its own economic interests. See, e.g., W. States Petroleum Ass'n v. EPA, 87 F.3d 280, 286 (9th Cir. 1996) (concluding that the legislative history of the CAA "indicates that Congress neither intended to subsidize all litigation under the Clean Air Act nor contemplated that § 307(f) would benefit financially able parties who, out of their own substantial economic interests, would have litigated anyway," so that it is not appropriate to award litigation costs to a "financially able, nongovernmental party having no more than its own economic interests at stake"). However, we conclude that there is no basis for disqualifying a party from receiving an award of attorney fees "merely because that party is solvent and has a financial interest in the outcome of the litigation." Costle, 683 F.2d at 943. If we were to hold otherwise and prohibit plaintiffs with an economic interest in the outcome of a CAA citizen suit from recovering attorney fees, we would weaken the enforcement of the Act, because competitors are most likely to have a substantial

-21-

financial interest in ensuring that their peers are CAA compliant, and they are also the most informed regarding the products offered and sold by their peers. Thus, because Pro Products assisted in the implementation of the Act by proving to the satisfaction of the district court that Airosol had violated the CAA, the public interest has clearly been served by its citizen suit.

Airosol also argues that an award of attorney fees would be inappropriate here because the facts at issue fall into the "special circumstances" exception that we set forth in Browder v. City of Moab, 427 F.3d 717, 721 (10th Cir. 2005). There we noted that sometimes an attorney fee award to a "prevailing party" is "unjust," despite the fact that a prevailing party is presumably entitled to an award of attorney fees. Id. Nonetheless, this argument lacks merit because the cases we cited in Browder as having "special circumstances" are factually distinguishable from the instant action. See, e.g., Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1200 (10th Cir. 1998) (explaining that "plaintiffs can give up their statutory entitlement to fees as part of the settlement arrangement"); Stewart v. Donges, 979 F.2d 179, 185 (10th Cir. 1992) (limiting the extent of attorney fee award to prevailing plaintiff because "he was responsible for the district court proceeding with the trial without jurisdiction"). In the present case, no "special circumstances" have been identified which would cause an award of attorney fees to be unjust.

III

In sum, we conclude the district court erred as a matter of law when it failed to consider all the necessary statutory factors in a CAA penalty analysis, considered some

-22-

factors it ought not to have considered, and improperly applied some of those factors it did consider. We conclude further that the district court abused its discretion and erred in its attorney fee analysis because it did not consider whether Pro Products achieved some degree of success on the merits. Finally, the district court erred as a matter of law in its attorney fee analysis by concluding that a party bringing a CAA claim is disqualified from receiving attorney fees solely because it is an economic competitor of the alleged violator.

We REVERSE the district court's decision and REMAND for further proceedings consistent with this opinion.

06-3299, *Pound v. Airosol Company, Inc.*

**HARTZ**, Circuit Judge, concurring:

I concur in the result. I add only one comment.

In its discussion of the attorney-fee award, the panel opinion errs in paying lip service to a public-interest element. A party seeking attorney fees under § 304(d) of the Clean Air Act, 42 U.S.C. § 7607(d), need not make a separate showing that it is serving the public interest. Courts should simply follow the rule that "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks omitted). Although *Hensley* was interpreting the attorney-fee provision in 42 U.S.C. § 1988, the Supreme Court has said that "[g]iven the common purpose of both § 304(d) and § 1988 to promote citizen enforcement of important federal policies, we find no reason not to interpret both provisions governing attorney's fees in the same manner." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986).